UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

    -against-

MATITYAU MOSHE MALKA and
MORDECHAY MALKA,

                   Defendants.

| USDC SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: __08/25/2022__ |

S3 19-CR-497 (NSR)
(05) (09)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

    On September 28, 2021, the Government filed the S3 Superseding Indictment charging Defendants Matityau Moshe Malka and Mordechay Malka, as well as other members of Lev Tahor,[1] with various counts related to the kidnapping of two minors—John Doe and Jane Doe—(the "Minors") from their Mother in New York. Specifically, the Government charged Matityau with (i) conspiracy to commit international parental kidnapping, unlawfully use of a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; and (ii) one count of international parental kidnapping in connection with the attempted March 2019 kidnapping of Jane Doe, in violation of 18 U.S.C. § 1204. ("S3," ECF No. 358.) The Government also charged Mordechay with (i) conspiracy to commit international parental kidnapping, unlawfully use of a means of identification, and enter by false pretenses the secure area of an airport, in violation of 18 U.S.C. § 371; and (ii) two counts of international parental kidnapping (one for each minor) in connection with the December 2018 kidnapping of the Minors,

---

[1] The Government also charged Nachman Helbrans (01), Mayer Rosner (02) Aron Rosner (03), Jacob Rosner (04), Yakov Weingarten (06), Shmiel Weingarten (07), and Yoil Weingarten (08). Nachman Helbrans and Mayer Rosner were tried and convicted together in November 2021. Jacob and Aron Rosner entered guilty pleas on April 25, 2022, and June 9, 2022, respectively. Yakov and Shmiel Weingarten have appeared before the Court and began proceeding *pro se* on May 10, 2022. Yoil Weingarten has yet to appear before this Court; the Court understands that he is currently in custody in Guatemala awaiting extradition to the United States in connection with this matter.

in violation of 18 U.S.C. § 1204. (*Id.*) On June 2, 2022, a jury convicted Matityau and Mordechay [hereinafter, "Defendants"] of all charges the Government brought against them.

Presently pending before the Court are Defendants' motions (a) for a judgment of acquittal, in which they argue that the evidence at trial was insufficient to sustain a conviction on any of the counts of which they were convicted; and (b) for a new trial, in which they argue that the Court erred in some of its rulings and that the Government engaged in prosecutorial misconduct at summations. (*See* ECF No. 687; "Matityau Motion," ECF No. 689; ECF No. 691; "Mordechay Motion," ECF No. 691-2.) The Government filed an opposition contending that all of Defendants' arguments are meritless and that the evidence at trial overwhelmingly established that Defendants committed the offenses with which they were charged. ("Response in Opposition," ECF No. 716.) For the following reasons, the Court DENIES all of Defendants' motions.

## STANDARD

### I.    Federal Rule of Criminal Procedure 29

After a jury returns a guilty verdict, Federal Rule of Criminal Procedure 29(c) allows a district court to, upon the defendant's motion, "set aside the verdict and enter an acquittal." Fed. R. Crim. P. 29. Courts evaluating a motion under Rule 29 should "review all of the evidence presented at trial in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Walker,* 191 F.3d 326, 333 (2d Cir. 1999) (internal quotation marks omitted); *United States v. Martinez*, 54 F.3d 1040, 1042 (2d Cir. 1995) (same). Courts must uphold a jury verdict if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Persico*, 645 F.3d 85, 105 (2d Cir. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1979) (emphasis in original)); *accord United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002). In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court

must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999)) (internal quotation marks and brackets omitted). "'A judgment of acquittal' is warranted 'only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013) (quoting *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004)).

The burden is on the defendant to make this showing, and the Second Circuit has repeatedly described that burden as "very heavy." *United States v. Desena*, 287 F.3d 170, 177 (2d Cir. 2002), *abrogated on other grounds*; *see also United States v. Caracappa*, 614 F.3d 30, 43 (2d Cir. 2010).

"[T]he task of choosing among competing, permissible inferences is for the [jury], not for the reviewing court." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, the Court must analyze the pieces of evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994), *abrogated on other grounds*; *see Autuori*, 212 F.3d at 114, and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130; *Reyes*, 302 F.3d at 53 ("we consider the evidence as a whole"); *Persico*, 645 F.3d at 104. The Court must also "credit[] every inference that the jury might have drawn in favor of the government," *United States v. Temple*, 447 F.3d 130, 137 (2d Cir. 2006) (internal quotation marks omitted), because "the task of choosing among competing, permissible inferences is for the fact-finder, not for the reviewing court," *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). "These standards apply whether the evidence being reviewed is direct or circumstantial." *Persico*, 645 F.3d at 105.

## II.    Federal Rule of Criminal Procedure 33

Federal Rule of Criminal Procedure 33(a) allows a district court, upon the defendant's motion, to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.

R. Crim. P. 33(a). Although the Court "has broad[] discretion to grant a new trial under Rule 33[,]" it "nonetheless must exercise [its] Rule 33 authority 'sparingly' and in 'the most extraordinary circumstances.'" *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (quoting *United States* v. *Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)); *United States* v. *Wong*, 78 F.3d 73, 79 (2d Cir. 1996). Indeed, "motions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).

"The defendant bears the burden of proving that he is entitled to a new trial under Rule 33." *United States* v. *McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal citations omitted). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice," *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414), and there "must be a real concern that an innocent person may have been convicted," *Sanchez,* 969 F.2d at 1414. "The trial court must be satisfied that competent, satisfactory and sufficient evidence in the record supports the jury verdict." *Ferguson*, 246 F.3d at 134 (citation and internal quotation marks omitted).

## DISCUSSION

### I.      Motions for Judgment of Acquittal

By their motions for a judgment of acquittal, Defendants renew the arguments they presented at the close of the Government's case and during summations to argue that the Government's evidence at trial was insufficient to sustain a conviction of any of the counts against them. (Matityau Mot. at 4; Mordechay Mot. at 2–3.)

At the close of the Government's case, Defendants generally argued that the Government failed to prove each and every element of the offenses charged. (Trial Tr. at 1324–26.) Matityau also particularly argued that, with respect to the attempted kidnapping charge, the Government's evidence only showed that his conduct did not reach the level of actual attempt—a similar

argument he had previously raised in his pretrial motion to dismiss the same count. (*Id.*; *see also* ECF No. 123.)

At summations, Defendants once again generally argued that the Government failed to prove each and every element of the offenses charged. (Trial Tr. at 1617–21.) Mordechay also particularly argued that the Government's evidence failed to show that he "intended to obstruct the parental rights of [the Mother]" and that "he intended to commit or agreed to commit all of the objects in the conspiracy" to kidnap the Minors. (*Id.* at 1618.)

In opposition, the Government contends that "the evidence—consisting principally of witness testimony from Jane Doe, Sara Helbrans, and Shimon Malka, as well as physical and documentary evidence corroborating the witness testimony—makes clear that" Defendants committed the offenses of which they were charged. (Resp. in Opp'n at 16–17.) After due consideration, the Court agrees with the Government.

> A.      *The Elements of the Charges Against Defendants*

The jury convicted Defendants of a conspiracy charge brought under 18 U.S.C. § 371 to commit the following three objects: international parental kidnapping, unlawfully use of a means of identification, and enter by false pretenses the secure area of an airport. The jury also convicted Defendants of substantive and attempted international parental kidnapping charges brought under 18 U.S.C. § 1204.

> 1.      Conspiracy, 18 U.S.C. § 371

To establish a conspiracy under § 371, the Government must prove: (1) the existence of an agreement between two or more persons to commit an unlawful act; (2) that the defendant knowingly engaged in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) the commission of an "overt act" by one or more members of the conspiracy in furtherance of the conspiracy. *See Reyes*, 302 F.3d at 53 (citations omitted).

"[T[he fundamental characteristic of a conspiracy is a joint commitment to an endeavor which, if completed, would satisfy all of the elements of the underlying substantive criminal offense." *Ocasio v. United States*, 578 U.S. 282, 287 (2016). "Although conspirators must pursue the same criminal objective, a conspirator need not agree to commit or facilitate each and every part of the substantive offense." *Id.* at 288 (quotations omitted). Further, "the Government has no obligation to demonstrate that each conspirator agreed personally to commit—or was even capable of committing—the substantive offense." *Id.* at 292. Indeed, "[i]t is sufficient [for the Government] to prove that the conspirators agreed that the underlying crime *be committed* by a member of the conspiracy who was capable of committing it. In other words, each conspirator must have specifically intended that *some conspirator* commit each element of the substantive offense." *Id.* (emphasis in original).

As the jury also found Defendants guilty of the international parental kidnapping charges against them, the Court will analyze the sufficiency of the conspiracy charge only by considering the international parental kidnapping of the Minors as the object of the conspiracy. *See, e.g.*, *United States v. Desnoyers*, 637 F.3d 105, 110 (2d Cir. 2011) ("The Supreme Court has made clear that there is 'no exception' to the rule that '[w]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged.'" (quoting *Griffin v. United States*, 502 U.S. 46, 56–57 (1991) (internal quotation marks and citations omitted))).

2.    International Parental Kidnapping, 18 U.S.C. § 1204(a)

To establish a violation for international parental kidnapping under § 1204(a), the Government must prove that the defendant: (1) removed or retained a child (who has been in the United States) outside the United States; and (2) did so with the intent to obstruct the lawful

6

exercise of parental rights. *See* 18 U.S.C. § 1204(a). Under the statute, the term "child" means a person who has not attained the age of 16 years. *Id.* § 1204(b)(1). Additionally, the term "parental rights" with respect to a child means "the right to physical custody of the child (A) whether joint or sole (and includes visiting rights); and (B) whether arising by operation of law, court order, or legally binding agreement of the parties." *Id.* § 1204(b)(2).

     *B.*    *Sufficiency of the Evidence Presented at Trial*

     After reviewing the totality of the evidence at trial and in the light most favorable to the Government, the Court concludes that the Government's evidence at trial was sufficient to sustain Defendants' conviction on all counts against them. At trial, the Government elicited witness testimony from Jane Doe (one of the Minors), Sara Helbrans (the Mother), and Shimon Malka (Mordechay's brother and a co-conspirator of Defendants), as well as physical and documentary evidence corroborating their witness testimony, that sufficiently established that Defendants conspired with others to kidnap the Minors. The evidence also sufficiently established that Mordechay aided and abetted the December 2018 kidnapping of the Minors, and that Matityau aided and abetted the attempted March 2019 kidnapping of Jane Doe. *See Persico*, 645 F.3d at 105 ("Section 2 provides, in pertinent part, that whoever 'aids, abets, . . . commands, induces or procures' the commission of a federal offense, or 'willfully causes an act to be done which if directly performed by him' would be a federal offense, 'is punishable as a principal.'" (quoting 18 U.S.C. § 2(a) and (b)).

     The following is a summary of the evidence the Government presented at trial.

        1.     Defendants are Members of Lev Tahor

     Defendants are members of an ultra-Orthodox Jewish sect called Lev Tahor. (Trial Tr. at 1387, 1499.) The sect was founded in the 1980s by Shlomo Helbrans, who led the group until his death in 2017. (*Id.* at 1519, 1407.) After Shlomo Helbrans died, his son, Nachman Helbrans, took

over as Lev Tahor's leader. (*Id.* at 1519.) Helbrans, among others, were known within the community as the "Hanhala," or management of Lev Tahor. Helbrans established the rules for the community and, together with the Hanhala, managed the operational affairs of the community. (*Id.* at 907, 1447.) Lev Tahor and its adherents, including Defendants, relocated frequently, starting in the United States before moving to Canada, Guatemala, Mexico, and then Guatemala again. (*Id.* at 910–11, 1386–87, 1499–1501.)

2.   The Hanhala Requires Jane Doe to Marry Jacob Rosner

In early 2018, the Hanhala required Jane Doe, who was 13-years old at the time, to religiously marry Jacob Rosner, who was 19-years-old. (*Id.* at 989.) Jane is Helbrans's niece and Jacob is the son of another member of the Hanhala, Mayer Rosner. (*Id.* at 906, 1526.) Jane and Jacob were not legally married, as marriage of a 13-year-old is illegal in Guatemala. (*Id.* at 1064, 912; *see also id.* at 1808 (Court's Jury Instructions).) Jane's mother, Sara Helbrans, who is also Helbrans's sister, objected to Jane's wedding but was unable to stop it from occurring. (*Id.* at 1063–64.) The entire community attended child marriages in Lev Tahor, including Defendants. (*Id.* at 913.)

3.   Sara Obtains a Child Custody Order for her Children in New York

In approximately October 2018, Sara determined that it was no longer safe for her children to remain in Lev Tahor under the authority of her brother. (*Id.* at 1065.) She left the community's compound and—with the help of U.S. authorities—arrived in the United States in early November 2018. (*Id.*)

A short time after Sara left Lev Tahor, Jane's father, who is also a member of Lev Tahor, took Jane and her other siblings, who were still in Guatemala, to Mexico in an effort to fraudulently obtain passports for the children. (*Id.* at 1286–87.) As a result, Jane, and her then-12-year old

brother John Doe and a third sibling were taken by law enforcement and reunited with their mother, Sara, in New York. (*Id.* at 1287.)

On November 14, 2018, Sara obtained a court order from Kings County Family Court granting her custody of all six of her children, including Jane and John Doe. (*See* GX 40.) Sara also obtained a protective order that prevented the father of the children from communicating with them. (*See* GX 41.)

### 4.   December 2018 Kidnapping of Jane and John Doe

Shortly after Sara obtained sole custody of her children, members of Lev Tahor devised a plan to kidnap the Minors to bring them back to the Lev Tahor community, and specifically to reunite Jane with Jacob, her religious husband. (*See* GX 500-A, 503-A; Trial Tr. at 905.) They directed others within Lev Tahor to execute on that plan and to ensure its success. (Trial Tr. at 900, 907.)

At the Hanhala's direction, several members of the group—Shmiel Weingarten, Jacob Rosner, Aron Rosner, Mordechay and Shimon Malka—met in Brooklyn, New York on December 5, 2018, at Aron Rosner's apartment. (*Id.* at 944.) At this time, Nachman Helbrans and Mayer Rosner were in Mexico together and were in communication with the other co-conspirators. (Trial Tr. at 952–58). Shmiel Weingarten stated during the meeting that Nachman Helbrans instructed them to take an oath of silence on a religious article and to promise to never talk about the kidnapping to anyone again. (*Id.* at 951–52.) As a result, Mordechay took the oath of silence not to tell anyone about the secret kidnapping. (*Id.* at 952.) During this meeting, Shmiel Weingarten also told Mordechay and Shimon Malka, in substance, that Lev Tahor always loses in court, and so the group had to take matters into their own hands and kidnap the children, even though it may

cause them to face jail time. (*Id.*) The group also purchased several burner phones and were instructed to only use aliases and an encrypted application to communicate. (*Id.* at 954–55.)

The following morning, on December 6, 2018, Shmiel Weingarten, Jacob Rosner, and Mordechay went to a Walmart store to buy disguises for the kidnapping. (*Id.* at 955.) They bought secular clothing for the kids, for themselves, and for Helbrans. (*Id.* at 955; *see also* GX 160–165, 171-G1.) The purpose of the disguises was to make it more difficult for law enforcement to identify the Minors and the kidnappers during the execution of the kidnapping. (*Id.* at 955–56.)

Later that day, Mordechay rented a silver Nissan Rogue to use as the get-away car for the kidnapping. (*See* GX 150, 500-A.) That evening, Shimon Malka, Shmiel Weingarten, Mordechay and Jacob Rosner met again, this time at Mordechay's apartment. (*Id.* at 957.) At this meeting, Shmiel told the others that someone nicknamed "Mishul" would come to transport the kids on flights to the border of Mexico, where they would then cross over by land. (*Id.* at 958.) As in the prior meeting, Shmiel Weingarten called Mayer Rosner during the meeting and the kidnapping was discussed on the call. (*Id.*) After the meeting, Mordechay drove Shimon Malka to deliver a cellphone to Jane at her apartment to enable her to communicate with the kidnappers. (*Id.* at 959–60.) This was because Jane was aware that the kidnappers were making efforts to take her back to Lev Tahor and she intended to go with them. (*Id.*)

The following day—December 7—Sara and her kids travelled from Brooklyn to Woodridge, New York to attend a holiday celebration at a family friend's home that was scheduled to occur from Friday evening through Saturday evening. (*Id.* at 1069.) Shimon Malka was also attending the celebration, and part of the kidnapping plan was for him to help get the Minors of the house when the other kidnappers came to pick them up. (*Id.* at 969.) At some point that evening, Mordechay and Shmiel Weingarten met Shimon Malka outside the house where the party was

occurring so that Shimon could show them around the neighborhood, and so that they could also set up a designated point where Mordechay and Shmiel Weingarten would pick up the children later that night. (*Id.* at 964.) The same day, Helbrans, Shmiel Weingarten, and Mordechay arrived at a motel near the house where Sara and her children were staying. (*See* GX 121-A, 122-A, 150, 500-A.)

Then, sometime between 2:00 a.m. and 3:00 a.m. on December 8, Shmiel Weingarten told Shimon Malka that it was time for him to wake up John Doe. (Trial Tr. at 969.) At 2:56 a.m., on December 8, the Minors walked outside of the house to the getaway car. (*See* GX 110.) Helbrans, Shmiel Weingarten, and Mordechay were in the car. (Trial Tr. at 1222.) Mordechay was the driver. (*Id.*)

Mordechay then drove the Minors and the others to a motel, where they changed into the disguises that Mordechay, Jacob, and Shmiel Weingarten had purchased for them at Walmart. (*Id.* at 1222–23; GX 101). From there, the group—with Mordechay driving again—drove to Scranton International Airport. (*Id.* at 1223–24; GX 101, 130.)

Once at Scranton International Airport, Helbrans and the Minors went through security. (*See* GX 130–133.) Helbrans used airplane tickets that were in his own children's names as documentation for the Minors. (*See* GX 130–133, 140–42.) Helbrans instructed the Minors to provide airport security with his own children's names when asked to identify themselves. (Trial Tr. at 1224.) Using these fake names, the Minors passed through security and boarded the flight with Helbrans. (*See* GX 130–133; Trial Tr. at 886–88.) They then took three domestic flights before landing in San Antonio and then driving across the border to Mexico. (*See* GX 140–42.)

Once in Mexico, Helbrans took the Minors to a hotel in Mexico City. (Trial Tr. at 1225.) Mayer Rosner, Jacob Rosner, Matityau, and other members of Lev Tahor met them at the hotel

shortly thereafter. (*Id.*) Soon after the group convened at a hotel in Mexico, the group—including Matityau—traveled to a house in the country in Mexico where they stayed until December 18, 2018. (*Id.* at 1226.)

On December 18, 2018, Mexican law enforcement raided the home and detained Matityau, Helbrans, Mayer Rosner, Jacob Rosner, and the other people in the house. (*Id.* at 1228; GX 190, 193.) During the raid, Mexican law enforcement did not find the Minors after they hid in a closet in the house. (Trial Tr. at 1229.) Matityau and the other men who were detained did not inform any law enforcement authorities that the Minors were still in the house alone. (*Id.* at 1542–43.)

After the raid, two other members of the Hanhala—Yoil and Shmiel Weingarten—came and retrieved the Minors. (*Id.* at 1230.) Law enforcement located the Minors shortly thereafter and recovered them on December 27, 2018, with Yoil Weingarten and Shmiel Weingarten. (*Id.* at 1231.) The Minors were then reunited with their Mother and brought back to Brooklyn. (*Id.* at 1232.)

5.   <u>March 2019 Attempted Kidnapping</u>

A few months later, in March 2019, Helbrans, Yakov Weingarten (a member of the Hanhala), Matityau, and other members of Lev Tahor attempted to kidnap the Minors again. (Trial Tr. at 1074–93, 1233–39.) At this time, Helbrans was detained at Westchester County Jail awaiting trial on charges related to the December 2018 kidnapping. (*See* GX 220.) Matityau visited Helbrans several times at Westchester County Jail in March 2019. (*See id.*; Trial Tr. at 1512.) Besides visiting Helbrans, Matityau was in near constant telephone contact with Yakov Weingarten during the relevant period, talking to Weingarten "about every 40 minutes." (Trial Tr. at 1203.) Matityau brought Jane multiple cell phones in an effort to facilitate her communication with members of the Hanhala about a plan to kidnap her again. (*See* GX 203, 204, 501-A; Trial

Tr. 1234, 1236, 1282.) In addition, a different member of Lev Tahor brought Jane prescription pills that were sedatives. (Trial Tr. at 1236; GX 201.)

When Sara learned what was happening, she started speaking directly with Yakov Weingarten and Helbrans. (*Id.* at 1074–93). On those calls, Helbrans and Yakov Weingarten threatened that they would take her children away, and Yakov Weingarten told Sara that they would fight her until "the last drop of blood." (*See* GX 321A-TI.) Helbrans also told Sara that her kids would be taken in the coming days. (Trial Tr. at 1090.) Moments after that phone call, Yakov Weingarten spoke on the phone to John Doe and told him that Matityau would meet him at a synagogue the following day to give him something. (GX 326-TI; Trial Tr. at 1091.) Sara informed law enforcement about the calls, and the kidnapping attempt was stopped before the Minors could be taken again. (Trial Tr. at 1082.)

6.   <u>March 2021 Attempted Kidnapping</u>

Two years later, in March 2021, another member of Lev Tahor, Moshe Alter, approached Jane Doe in New York and attempted to kidnap the Minors once again. (Tr. 1186–98, 1241–42; GX 230–35.) At the time of this attempted kidnapping, Alter possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to Jane and John Doe. (*See* GX 230–35.)

In sum, when considering the evidence above and crediting every inference that the jury might have drawn in the Government's favor, with respect to the conspiracy charge, the evidence at trial sufficiently established that Defendants conspired with others to kidnap the Minors from their Mother in New York in the middle of the night, to hide the Minors from authorities in Mexico to prevent their return to their Mother, and then to try to kidnap them again even after the Minors were returned to their Mother.

With respect to the international parental kidnapping charges against Mordechay, the evidence at trial sufficiently established that Mordechay aided and abetted the Minors' December 2018 kidnapping by: (1) purchasing disguises from Wal-Mart; (2) renting the get-away car; and (3) picking up the Minors at around 3:00 a.m. with co-conspirators before dropping them off at the airport in Pennsylvania. And with respect to the international parental kidnapping charges against Matityau, the evidence at trial sufficiently established that Matityau aided and abetted Jane Doe's attempted March 2019 kidnapping by sneaking Jane Doe several cellphones and interfacing between Lev Tahor leaders in prison and in Guatemala.

C.    *Matityau's Insufficiency Argument on Attempted Kidnapping*

Nonetheless, Matityau specifically argues that the evidence at trial is insufficient to establish that his conduct reached the level of actual attempt for his attempted international parental kidnapping charge. (Matityau Mot. at 4.) Relying on similar arguments he raised in his previous motion to dismiss, Matityau argues that his relevant conduct—namely, "meeting in public with the 14 year old [Jane Doe] on multiple occasions . . . and handing her cell phones"—is insufficient to constitute a "substantial step" that "strongly corroborates [his alleged] criminal intent" to commit (or aid and abet) international parental kidnapping. (ECF No. 123 at 18–21). However, Matityau overlooks that when analyzing the sufficiency of the Government's evidence at trial, the Court must analyze the evidence in its totality and not just his cellphone delivery to Jane Doe in isolation.

"In order to establish that a defendant is guilty of an attempt to commit a crime, the government must prove that the defendant [(1)] had the intent to commit the crime and [(2)] engaged in conduct amounting to a 'substantial step' towards the commission of the crime." *United States v. Yousef*, 327 F.3d 56, 134 (2d Cir. 2003) (quoting *United States v. Rosa*, 11 F.3d 315, 337 (2d Cir. 1993)). "For a defendant to have taken a 'substantial step,' he must have engaged in more

14

than 'mere preparation,' but may have stopped short of "the last act necessary" for the actual commission of the substantive crime." *Id.* (quoting *Rosa*, 11 F.3d at 337). "A defendant may be convicted of attempt even where significant steps necessary to carry out the substantive crime are not completed, so that 'dangerous persons [may be apprehended] at an earlier stage . . . without immunizing them from attempt liability.'" *Id.* (quoting *United States v. Jackson*, 560 F.2d 112, 120 (2d Cir. 1977)).

Here, the Court concludes that the evidence at trial, when viewed in the light most favorable to the Government, is sufficient to sustain Matityau's conviction for attempted international parental kidnapping. The evidence at trial first indicated that in December 2018, Matityau and others met with Helbrans and the Minors at a hotel in Mexico, after which they traveled to a house in the country. (Trial Tr. at 1225–26.) The evidence also indicated that when Mexican law enforcement raided the house to look for the Minors, Matityau and the other men who were detained did not inform any law enforcement authorities that the Minors were hiding in the closet by themselves. (*Id.* at 1542–43.)

The evidence at trial also indicated that Matityau met with Helbrans at Westchester County Jail several times in March 2019. (*See* GX 220; Trial Tr. at 1512.) At the same time, Matityau was in constant telephone contact with Yakov Weingarten, talking to him "about every 40 minutes." (Trial Tr. at 1203.) Matityau had these communications with Yakov Weingarten and meetings with Helbrans around the same time that he brought Jane Doe multiple cell phones. (*See* GX 203, 204, 501-A; Trial Tr. at 1234, 1236, 1282.)

The evidence at trial further showed that when Jane Doe's mother, Sara, learned about what was happening, she started speaking directly with Yakov Weingarten and Helbrans—who threatened to take the Minors away from her and fight her until "the last drop of blood." (*See* GX

321A-TI; Trial Tr. at 1074–93.) It also showed that moments after threatening to take the Minors away from Sara, Yakov Weingarten spoke on the phone to John Doe and told him that Matityau would meet him at a synagogue the following day to give him something. (GX 326-TI; Trial Tr. at 1091.)

Considering the evidence above, a rational trier a fact could infer that by time he provided Jane Doe with the phones in March 2019, Matityau (1) knew of the unlawful plans to take the Minors away from Sara since at least December 2018; (2) knew that Mexican law enforcement raided the home looking for the Minors after his co-conspirators unlawfully took them away from Sara; (3) deliberately chose not to divulge the Minors' location to Mexican law enforcement as he knew he would otherwise impede the unlawful kidnapping plans; (4) interfaced with Helbrans in Westchester County Jail and over the phone with Yakov Weingarten concerning a second attempt to kidnap the Minors; and (5) knew that providing the phones to Jane Doe facilitated communications between her and his co-conspirators to carry out the second attempt to kidnap the Minors—just like such similar conduct had achieved for the December 2018 kidnapping, (*see* Trial Tr. at 959–60 (evincing that Shimon Malka delivered a cellphone to Jane Doe so that she could communicate with the kidnappers to execute the December 2018 kidnapping)).

As such, a rational trier of fact could infer from the evidence above that Matityau not only "had the intent to commit" international parental kidnapping, but that his delivery of the cellphones to Jane Doe constituted a "substantial step" in executing the attempted kidnapping in March 2019 beyond a reasonable doubt. *Yousef*, 327 F.3d at 134 (quoting *Rosa*, 11 F.3d at 337).

### D.  *Mordechay's Insufficiency Argument on Lack of Criminal Intent*

Mordechay similarly advances a specific attack on the sufficiency of the evidence at trial. (Mordechay Mot. at 2.) Relying on similar arguments he raised during summations, Mordechay argues that the Government's evidence failed to show that he "intended to obstruct the parental

rights of [the Mother]" or that "he intended to commit or agreed to commit all of the objects in the conspiracy" to kidnap the Minors. (Trial Tr. at 1618.) Simply put, Mordechay argues that the evidence is at trial is insufficient to establish his criminal intent. But the Court is of the view that the Government presented ample credible evidence at trial establishing Mordechay's criminal intent.

The evidence at trial first showed that Mordechay met with others on December 5, 2018, to discuss the plans to take the Minors away from their Mother and that he took an oath of silence promising to never discuss such plans to anyone again. (Trial Tr. at 944, 951–52.) It also showed that during the meeting, Shmiel Weingarten told Mordechay and Shimon Malka, in substance, that Lev Tahor always loses in court, and so the group had to take matters into their own hands and kidnap the Minors, even though it may cause them to face jail time. (*Id.* at 952.) Mordechay and others also purchased several burner phones and were instructed to only use aliases and an encrypted application to communicate. (*Id.* at 954–55.)

The evidence at trial also showed that on December 6, 2018, Mordechay and others went to a Walmart store to buy disguises for the kidnapping—that is, secular clothing for the Minors and the conspirators to avoid detection from law enforcement. (*Id.* at 955; GX 160–165, 171-G1.) That evening, Mordechay and others met at his own apartment, during which Shmiel Weingarten told them that someone nicknamed "Mishul" would come to transport the kids on flights to the border of Mexico, where they would then cross over by land. (*Id.* at 957–58.)

The evidence at trial further showed that Mordechay drove (1) Shimon Malka to deliver a cellphone to Jane Doe to facilitate communication with the kidnappers; (2) his co-conspirators to a motel near the house where the Minors were staying; (3) the Minors and the co-conspirators in

the middle of the night from the house the Minors were staying, first to the motel and then to the international airport. (*Id*. at 960, 1222–24; GX 101, 110, 130, 121-A, 122-A, 150, 500-A.)

Considering the evidence above, a rational trier a fact could infer that since the time he met with his co-conspirators on December 5, 2018, Mordechay knew that the plan to take the Minors away from their mother was unlawful in two potential ways: (1) in violation of the Kings County order granting Sara custody over the Minors; and (2) in violation of Sara's parental rights as the biological mother of the Minors. Both of these contraventions constitute an obstruction of parental rights under § 1204. *See* 18 U.S.C. § 1204(b)(2); *see also United States v. Malka*, --- F. Supp. 3d ---, S319CR497NSR0509, 2022 WL 1488568, at *17 (S.D.N.Y. May 11, 2022) ("As the Second Circuit has consistently held, under New York law, 'the biological mother . . . enjoys the right to physical custody of her children unless and until this right is terminated by law.'" (quoting *United States v. Amer*, 110 F.3d 873, 878 (2d Cir. 1997)).

Moreover, a rational trier of fact could infer that Mordechay both intended and agreed to execute the kidnapping of the Minors as he (1) discussed with his co-conspirators on December 5, 2018, the plans to take the Minors away from their Mother and back to the Lev Tahor community in Guatemala; (2) bought disguises for the Minors to avoid detention from law enforcement; (3) picked up the Minors in the middle of the night from a home in New York; and (4) drove the Minors and Helbrans in the middle of the night to an international airport.

As such, a rational trier of fact could infer from the evidence above that Mordechay not only conspired and acted with the intention to obstruct Sara's parental rights, but also that he knowingly acted and agreed with others to unlawfully remove the Minors from the United States to Guatemala beyond a reasonable doubt.

Accordingly, the Court denies Defendants' motions for judgment of acquittal.

18

## II.     Motions for a New Trial

By their motions for a new trial under Rule 33, Defendants argue that several "manifest injustices" occurred during trial, including that (1) the Court improperly admitted evidence against Matityau of a third kidnapping attempt by a co-conspirator in March 2021, (Matityau Mot. at 5–10); (2) the Court erred in precluding Mordechay from introducing alleged evidence that he intended to "rescue" the Minors and not kidnap them, (Mordechay Mot. at 3–7); and (3) the Government committed prosecutorial misconduct at summations against both Defendants, (*id.* at 7–10; Matityau Mot. at 10–13.) The Court addresses those three arguments in that order.

### A.     *Admission of Evidence Related to the March 2021 Attempted Kidnapping*

In relevant part, the S3 Superseding Indictment charged Matityau and Mordechay with an international parental kidnapping conspiracy spanning from December 2018 to March 16, 2021. (S3 ¶ 20.) The conspiracy included three separate kidnapping and kidnapping attempts by their participants: the December 2018 kidnapping, the March 2019 kidnapping attempt, and the March 2021 kidnapping attempt. (*Id.* ¶¶ 8–16.) With respect to the March 2021 kidnapping attempt, the S3 Superseding Indictment charged, in relevant part, that:

> In or about March 2021, CC-1, a member of Lev Tahor, approached the Minors in New York and attempted to kidnap them once again. At the time of this attempted kidnapping, CC-1 possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Minors. By late March 2021, CC-1 had returned to the Lev Tahor compound in Guatemala.

(*Id.* ¶ 16).

On March 18, 2022, the Government filed its motions in *limine*, providing Defendants with notice of evidence the Government viewed as "admissible as direct evidence of the crimes charged." (ECF No. 478 at 1.) Among the evidence included in its motion, the Government detailed how, "in March 2021, another member of Lev Tahor approached the [Minors] in New

York and attempted to kidnap them once again. At the time of this attempted kidnapping, the Lev Tahor member possessed three bus tickets from New York to Georgia, drop phones, children's clothing, and birth certificates for two children of ages similar to the Victims." (*Id.* at 6.)

On May 26, 2022, the Government raised before the Court its intention to have Special Agent Jed Salter from the Federal Bureau of Investigation (FBI) testify about the March 2021 kidnapping attempt. (Trial Tr. at 1138.) Specifically, the Government proffered that Salter would provide limited testimony regarding the March 2021 kidnapping attempt, given that it was part of the alleged conspiracy and because it rebutted Matityau's argument that he lacked criminal intent when he provided Jane Doe cellphones in March 2019. (*Id.* at 1138–40.)

At trial, Matityau's counsel objected to Salter's testimony, arguing that (1) there was no factual connection between Matityau and the March 2021 kidnapping attempt (*id.* at 1142); (2) the March 2021 kidnapping attempt was too remote in time to be relevant (*id.* at 1143); (3) there is a "higher degree of proof" for the March 2021 kidnapping attempt than for the one in March 2019 (*id.* at 1145); and (4) the evidence's probative value, if any, was substantially outweighed by unfair prejudice (*id.* at 1146).

After hearing oral argument from both sides, the Court orally held that Salter's testimony was admissible, concluding that (1) the probative value of the evidence of the March 2021 kidnapping attempt was not substantially outweighed by prejudice, if any, because the kidnapping attempt occurred during the charged conspiracy; (2) the evidence demonstrated a "pattern" of "getting phones to the Minors"; and (3) the kidnapping attempt served to rebut Matityau's argument that providing the phones to Jane Doe constituted an "innocent transfer of phones." (*Id.* at 1142–43, 1150, 1152.) The Court asked Matityau's counsel whether they were requesting a

20

limiting instruction, to which counsel declined, stating "Your Honor, as to my client, we are not looking for a limiting instruction." (*Id.* at 1151.)

Later that day, Salter testified that after learning that a Lev Tahor member had approached Jane Doe in Brooklyn on March 16, 2021, he responded to the scene and confronted an individual later identified as Moshe Alter. (*Id.* at 1189.) After searching Alter, Salter found on his person: 3 cellphones, 2 SIM cards, and 3 one-way bus tickets to Georgia. (*See* GX 230–33.) Salter also testified that the FBI recovered 2 birth certificates from backpacks in Alter's possession, containing dates of birth that were close in time to those of the Minors. (Trial Tr. at 1196; *see also* GX 234–35.) Salter further testified that several weeks after the incident, he traveled to Lev Tahor's Guatemala compound and observed Alter among other community members. (Trial Tr. 1197.) After Salter finished testifying, the Court again asked Matityau's counsel whether they would like a limited instruction, but counsel again demurred, stating, "[w]e did not ask for a curative instruction, and we are not asking for one now." (*Id.* at 1206.)

That same day, Jane Doe also testified about the March 2021 kidnapping attempt. Specifically, Jane testified that she "was walking in the morning to go to work" when Alter "stopped" her, saying "I am Moshe Alter. And I want to know if you want to come back to Guatemala, to the community." (*Id.* at 1241.) When asked how she responded, Jane testified that "yes, I want to come back, but I'm not fool. I don't want more people to be in trouble." (*Id.*)

During summations, the Government discussed the March 2021 kidnapping attempt as another attempt in the charged conspiracy to kidnap the Minors:

> After that attempt, some time passed and it looked like Sara and her kids might be safe, but the Lev Tahor leaders had not given up yet. Just over a year ago, in March 2021, members of Lev Tahor tried to kidnap the kids for a third time, and they returned to the same play book they had used twice before. Jane explained this incident to you. A member of Lev Tahor named Moshe Alter approached her as she walked to work and offered to take her back to Guatemala right then and there. Law

> enforcement then found Alter in the area and they searched him and Alter had three bus tickets dated that same day destined for Atlanta. He had birth certificates for other children, a boy and a girl, who were about the same age as Jane and John. He had three phones, including a drop phone. Sound familiar? It's the same play book. Use a loyal foot soldier, fake documents and drop phones to remove the kids from their mother and bring them out of the country. Fortunately, law enforcement intervened and stopped this kidnapping from happening.

(*Id.* at 1657–58.) Following the Government's summation, Matityau's defense counsel moved for a mistrial, arguing that:

> there was no evidence in the record indicating that Moshe Alter did anything other than acting on his own. No record evidence regarding any contact with any of the co-conspirators, charged or uncharged. The only record of evidence in the case was the fact that there was evidence that he had resided at Lev Tahor and been seen in the Lev Tahor community afterwards.

(*Id.* at 1676–77.)

The Court denied Matityau's motion for a mistrial, finding that there was evidence in the record of the March 2021 kidnapping attempt—in particular, the testimony of Salter and Jane Doe—and reiterating that evidence of this attempt was admitted as direct evidence of the charged conspiracy as the Government is entitled to "ask[] the jurors to . . . make certain inferences." (*Id.* at 1680.)

During summations, Matityau's defense counsel argued at length about the March 2021 kidnapping attempt, first using it to cast doubt on the March 2019 kidnapping attempt, as follows:

> Who is next witness that was relevant to my client? Investigator Salter, who came in and testified about a third attempted kidnapping in March of 2021, over two years beyond the last act alleged to have been committed by my client in March of 2019 and more than two years beyond the original November 2018 kidnapping. And so if you want to know what an attempted kidnapping is, that's an attempted kidnapping. Moshe Alter had bus tickets, he had phones, he had fake identification, passports. That's an attempted kidnapping where I come from.

(*Id.* at 1705–06.)

Matityau's counsel next used the March 2021 kidnapping attempt to argue that the

Government's entire case against Matityau was predicated on guilt-by-association:

> The problem is, ladies and gentlemen, how do we know that the government's
> position in this case is to implicate anyone in Lev Tahor that has anything to do
> with Lev Tahor as part of this conspiracy? Moshe Alter, two years later, did these
> things. You heard the testimony. What evidence did you hear that Moshe Alter ever
> had a conversation with any of the main co-conspirators in this case; with
> Mordechay, with Helbrans, with the Weingartens? There wasn't a single shred of
> evidence that Moshe Alter had a single interaction with any of these people.
>
> Did you hear about an arrest of Mr. Alter? Did you see his picture? Do you
> remember during the opening statement, as the evidence went in, they put up the
> picture of each co-conspirator as it went on. You never even saw a picture of Moshe
> Alter. You know why? Because it's insufficient evidence that Moshe Alter had
> anything to do with the conspiracy. Was it a bad act? Is this something that he
> shouldn't have done? Did you hear anything about how he's connected with this
> conspiracy other than the fact that he was there two years later, spoke to Jane,
> produced these things, was found? You had pictures of the evidence and that's it.
> It was dropped. Nothing more. What evidence?
>
> . . . .
>
> And so how does Salter connect him to the conspiracy? Because he's a member of
> Lev Tahor. And what was the tell? The tell was he flew to Guatemala and saw him
> at Lev Tahor. That was his testimony. But when asked the direct question by the
> prosecutor, again, another prosecution witness, about my client's involvement in
> the March 2021 kidnapping attempt, the answer was no.

(*Id.* at 1706–07.)

Now, by his instant motion for a new trial, Matityau argues that evidence about the March

2021 kidnapping attempt "should not have been admitted, as it was irrelevant, misleading, [and]

extremely prejudicial." (Matityau Mot. at 5.) Specifically, Matityau argues, once again, that the

Government presented no evidence at trial indicating that Alter was part of the alleged conspiracy

as he had ever met or interacted with either Matityau or any of the other indicted or unindicted co-

conspirators. (*Id.* at 6–7.) Further, Matityau argues that the evidence was irrelevant because Alter's

actions in 2021 were not only remote in time when compared to Matityau's alleged actions in

2019, but that they differed in that Alter had attempted to give Jane Doe phones, bus tickets, and birth certificates, and not just phones as Matityau had done. (*Id.*)  And lastly, Matityau argues that even if such evidence had some probative value, that value was substantially outweighed by unfair prejudice. (*Id.*) But after due consideration, the Court disagrees.

First, the Court concludes that the Government presented "competent, satisfactory, and sufficient evidence" at trial to support a jury finding that Alter was acting in furtherance of the same conspiracy to kidnap the Minors in which Matityau was involved. The Government was not required to present any direct evidence of Alter's association with the conspirators, including Defendants, to prove that he was acting in furtherance of the charged conspiracy. As the Second Circuit has previously held, "[b]oth the existence of a conspiracy and a given defendant's participation in it with the requisite knowledge and criminal intent may be established through circumstantial evidence." *United States v. Stewart*, 485 F.3d 666, 671 (2d Cir. 2007) (citing cases).

Here, the record contains ample circumstantial evidence from which a jury could reasonably infer that Alter's conduct was yet another continuation of the conspirators' plan to kidnap the Minors. To begin, the Government presented evidence indicating that (i) the Hanhala exerted overwhelming control over Lev Tahor adherents; (ii) the Hanhala was undeterred in its desire to return the Minors to Lev Tahor; and (iii) Alter was a member of Lev Tahor. (*See*, *e.g.*, Trial Tr. at 908 (Shimon Malka testifying that the Hanhala prohibited him from speaking to his family and wife); *id.* at 1055 (Sara Helbrans testifying that members of Lev Tahor were required to follow the rules of the Hanhala); GX 321A-TI (Hanhala member Yakov Weingarten threatening to "fight" Sara Helbrans for her children until the "last drop of blood"); *id.* at 1197 (Salter testifying that Alter was present in Lev Tahor compound), *id.* at 1241 (Jane Doe testifying that Alter was a Lev Tahor member who approached her to return to "Guatemala, to the community").)

Additionally, the Government presented evidence that Alter's conduct in March 2021 was substantially similar to that of the other conspirators in furtherance of the conspiracy in both December 2018 and March 2019. (*See, e.g.*, *id.* at 959–60 (Shimon Malka testifying that he delivered a phone to Jane Doe to enable her to communicate with the kidnappers to take her back to Lev Tahor in 2018); *id.* at 1074–93, 1234, 1236, 1282; GX 203, 204, 321A-TI, 501-A (indicating that Matityau delivered phones to Jane Doe to communicate with the Weingartens, including Yakov, who had threatened Sara Helbrans to take her children away from her and fight her to "the last drop of blood"); Trial Tr. at 1091; GX 326-TI (indicating that Yakov Weingarten spoke on the phone with John Doe, telling him that Matityau would meet him at a synagogue the following day to give him something).)

Moreover, the Government presented evidence at trial showing that Lev Tahor leaders— Helbrans and Yakov Weingarten, in particular—made clear to Sara Helbrans over the phone that they would not relent on their plans to take away her children away until the Minors returned to Lev Tahor. (*See* GX 321A-TI.) Indeed, the Government also presented evidence showing that Helbrans made these threats to Sara and orchestrated the March 2019 kidnapping attempt while he was incarcerated after his arrest for the December 2018 kidnappings. (*See* Trial Tr. at 1089.) From these pieces of circumstantial evidence, a jury could reasonably infer that, because the conspirators had made an open-ended threat to take Sara's children away from her, they would keep trying to accomplish the goal of the conspiracy even if some of them were incarcerated. *See, e.g.*, *United States v. Benussi*, 216 F. Supp. 2d 299, 311 (S.D.N.Y. 2002) ("Once a conspiracy is shown to exist, which in its nature is not ended merely by lapse of time, it continues to exist until consummated, abandoned or otherwise terminated by some affirmative act."); *Persico*, 832 F.2d at 716 (noting that "the mere imprisonment of some of its members does not precipitate the demise of the

conspiracy"); *United States v. Katz*, 601 F.2d 66, 68 (2d Cir. 1979) (arrest of a co-conspirator does not necessarily extinguish a conspiracy). As such, when considering all of the evidence mentioned in its totality, a reasonable jury could conclude that Alter was acting in furtherance of the conspiracy to kidnap the Minors.

But Matityau nonetheless argues that the March 2021 "kidnapping attempt" cannot be considered part of the conspiracy because, as a matter of law, Alter's conduct cannot constitute an international parental kidnapping attempt as Jane Doe was 16 years old in March 2021. (Matityau Mot. at 9); *see also* 18 U.S.C. § 1204(b)(1) (providing that the term "child" means a person who has not attained the age of 16 years).

To be sure, the Government does not dispute that Jane Doe was 16 years old in March 2021 and that she cannot be considered a "child" under § 1204. (*See* Resp. in Opp'n at 29.) However, the evidence at trial showed that Jane Doe was not the only one whom Alter sought to return to the Lev Tahor community in Guatemala, but also John Doe—who was indisputably under the age of 16 at time. (*See, e.g.*, Trial Tr. at 1196; GX 230–35 (indicating that Alter had 2 birth certificates containing dates of birth that were close in tome to those of the Minors).) And as the conspiracy charge involved the kidnapping of *both* Minors, then a reasonable jury could still consider Alter's conduct as part of the overall conspiracy.

Indeed, even when putting aside that the March 2021 kidnapping attempt also involved John Doe, the Government was able to still offer Alter's conduct in March 2021 to prove the existence of the overall conspiracy *with respect to Jane Doe*. It is well established that the "acts of one alleged conspirator could be admitted into evidence against the other conspirator, if relevant to prove the existence of the conspiracy, even though they might have occurred after the conspiracy ended." *United States v. Bermudez*, 526 F.2d 89, 96 (2d Cir. 1975) (internal quotation marks

omitted) (quoting *Anderson v. United States*, 417 U.S. 211, 219 (1974) (quoting *Lutwak v. United States*, 344 U.S. 504, 618 (1953))); *see also United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("[Where] the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself." (internal quotation marks and citations omitted)). Therefore, even if the charged conspiracy here with respect to Jane Doe ended once she turned 16, the Government could still offer Alter's conduct in March 2021 to prove that the charged conspiracy existed throughout the relevant period until Jane Doe became 16—a period that covers March 2019, when Matityau similarly provided her with cellphones to communicate with her kidnappers.

Second, the evidence about Alter's conduct during the March 2021 kidnapping attempt was relevant at trial for several reasons. To start, as briefly mentioned above, such evidence is admissible as direct evidence of the conspiracy charge against Defendants. As the Second Circuit has previously held, conspiracy is "a continuing crime[] that is not complete until the purposes of the conspiracy have been accomplished or abandoned." *United States v. Pizzonia*, 577 F.3d 455, 466 (2d Cir. 2009) (internal quotation marks and citations omitted). "Foreseeable acts of one co-conspirator in furtherance of the conspiracy are attributable to all co-conspirators," *United States v. Milstein*, 401 F.3d 53, 72 (2d Cir. 2005), a "principle [which] is applicable even if the coconspirator who so acts is unindicted," *United States v. Grimm*, 738 F.3d 498, 505 (2d Cir. 2013).

Here, the charged conspiracy extended through March 2021, and no evidence at trial indicated that either Matityau or Mordechay withdrew from the conspiracy at any time. *See United States v. Flaharty*, 295 F.3d 182, 192 (2d Cir. 2002) ("Withdrawal is an affirmative defense and the defendant has the burden of showing that he performed affirmative acts that were inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach

co-conspirators; mere cessation of activity is not sufficient. Positive evidence of withdrawal is required in order to provide assurance that the defendant genuinely removed himself from the conspiracy and is not simply attempting an after-the-fact escape from liability." (cleaned up)). For that reason, the evidence about Alter's conduct during the March 2021 kidnapping attempt was relevant as direct evidence of the conspiracy charge against Defendants. *See United States v. Dioguardi*, 20 F.R.D. 10, 14–15 (S.D.N.Y. 1956) ("Whether defendant joined the conspiracy early or late, all acts and statements of co-conspirators in furtherance of the conspiracy are admissible against him and would be so admissible whether he were tried separately or jointly.").

Furthermore, such evidence was also admissible under Federal Rule of Evidence 404(b) to rebut Matityau's main argument throughout the trial that his conduct (*i.e.*, providing Jane Doe cellphones in March 2019) was essentially an innocent act that was neither in furtherance of the charged conspiracy nor part of the March 2019 kidnapping attempt. (*See, e.g.*, Trial Tr. at 644 ("The only action that I did is I was handing over a simple means of communication as a cellphone for her to be -- to have the opportunity -- to have the opportunity to -- to cry out for justice. Honestly, giving someone a phone is not an attempt to kidnap them."); *id.* at 1710 ("[The Government] want[s] you to believe that the simple act of giving a phone makes up for all of the other stuff that [its] need to prove this case beyond a reasonable doubt, certainly as to conspiracy and certainly as to an attempted kidnapping from the simple act of giving a phone, Count Four. It's not enough, ladies and gentlemen."); *id.* at 1715 ("Giving a phone by itself . . . is not an attempted kidnapping. It's just not enough.").)

Federal Rule of Evidence 404(b) provides, in relevant part, that while "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that a particular occasion the person acted in accordance with the character[,]" this evidence "may be

28

admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b)(1)–(2). "It is well-established in this circuit that evidence of *subsequent* similar acts, including other crimes, is admissible in the discretion of the trial court if it is substantially relevant for a purpose other than merely to show a defendant's criminal character or disposition." *United States v. Cavallaro*, 553 F.2d 300, 305 (2d Cir. 1977) (emphasis added) (internal quotation marks omitted). "The proof is admissible even if the acts occurred after the crime charged in the indictment." *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1149 (2d Cir. 1978) (citations omitted).

Here, as the Government indicated during summations, Alter's conduct in March 2021 followed a substantially identical "play book" to the one Matityau followed in March 2019 and the one Shimon Malka followed in December 2018. Namely, all three undertakings similarly involved delivering phones to Jane Doe so that the conspirators could communicate with her and take the Minors away from Sara in New York and back to the Lev Tahor community in Guatemala. And while Matityau argues that his delivery of the phones was "innocent" because he delivered such phones in public view (Matityau Mot. at 9), all three undertakings also similarly involved the conspirators delivering the phones to Jane *without her Mother present*—from which a reasonable jury could infer that these cellphone deliveries were contrary to Sara's wishes and with the intent to obstruct her parental rights over Jane. Thus, the evidence at trial here was substantially probative of Matityau's intent to kidnap and knowledge of the nature of his conduct, as well as the common plan or design of the kidnapping conspiracy. *See Cavallaro*, 553 F.2d at 305 (holding that evidence of subsequent kidnapping of another victim admissible as probative of intent to kidnap, as well as of common plan or design).

And third, contrary to Matityau's argument, the probative value of the evidence here was not substantially outweighed by unfair prejudice. Matityau argues that based on the "closeness of the case" against him and the two-year temporal "remoteness" between his own conduct and that of Alter's, the limited probative value, if any, of Alter's conduct here was substantially outweighed by unfair prejudice. (Matityau Mot. at 9–10.)

But the evidence at trial shows that the case against Matityau was anything but "close." Most notably, Matityau's main argument at trial was that his delivery of the cellphones to Jane Doe was merely an innocent act and that he lacked the intent to further any kidnapping. Yet, Matityau's argument only considers his conduct in isolation. As noted above, when considering the totality of the evidence presented, a rational trier a fact could infer that by time he provided Jane Doe with the phones in March 2019, Matityau not only "had the intent to commit" international parental kidnapping, but that he knew that the delivery of the phones to Jane Doe constituted a "substantial step" in executing the attempted kidnapping in March 2019 beyond a reasonable doubt. *Yousef*, 327 F.3d at 134 (quoting *Rosa*, 11 F.3d at 337). Indeed, the Court reached this conclusion without even considering any evidence of the March 2021 kidnapping attempt.

It follows then, that because a rational trier of fact could have nonetheless rendered a guilty verdict against Matityau *in the absence of* the evidence of the March 2021 kidnapping attempt, "letting [the] guilty verdict stand [here] would [not] be a manifest injustice," *Ferguson*, 246 F.3d at 134 (citing *Sanchez*, 969 F.2d at 1414), especially because there is no "real concern that an innocent person may have been convicted," *Sanchez,* 969 F.2d at 1414. Instead, the Court is "satisfied that competent, satisfactory and sufficient evidence in the record supports the jury

verdict" against Matityau. *Ferguson*, 246 F.3d at 134 (citation and internal quotation marks omitted).

    B.    *Preclusion of Evidence Related to Mordechay's Alleged Intent to "Rescue" the Minors*

Next, by his own motion for a new trial, Mordechay argues that the Court erred in precluding evidence of his purported "purpose" behind his relevant conduct. Namely, Mordechay argues that he was "muzzled from uttering a word" about how he "lacked the [intent] to" interfere with Sara Helbrans's parental rights because his purpose was to "rescue" the Minors. (Mordechay Mot. at 4–5.) But as the Government points out, Mordechay's motion is yet again another attempt to relitigate a pretrial ruling that the Court has repeated *ad nauseum* at different stages of this litigation. (Resp. in Opp'n at 32.)

Courts routinely deny attempts to relitigate already resolved matters under the guise of a Rule 33 motion. *See United States v. Donziger*, No. 11 Civ. 691 (LAK), 2021 WL 3726913 (S.D.N.Y. Aug. 23, 2021) (denying Rule 33 motion premised on the same arguments already decided in motion to dismiss and calling such attempt to relitigate "fatal to [the Rule 33] motion"); *United States v. Flom*, 256 F. Supp.3d 253, 271–72 (E.D.N.Y. 2017) (denying Rule 33 motion based on claim of erroneous district court pretrial motions where defendant "fail[ed] to provide any new theories, legal support, or factual contention that would justify" reconsideration of prior rulings); *United States v. Delva*, No. 12-CR-802 (KBF), 2015 WL 6294880, at *7 (S.D.N.Y. Feb. 13, 2015 (denying Rule 33 motion as attempt to relitigate pretrial evidentiary motions); *United States v. Soto*, No. 12-CR-566 (RPP), 2017 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[A] Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions.").

In its ruling on the parties' motions in *limine*, the Court precluded Defendants from arguing at trial that they believed that they were "rescuing" the Minors. Specifically, the Court held that such argument was irrelevant because (i) it was an affirmative defense neither contained in nor recognized under 18 U.S.C. § 1204; (ii) Defendants' purported "motive" in committing the kidnapping of the Minors was not a defense because it did not negate their "intent" to obstruct Sara's parental rights (that is, even if Defendants acted with the "motive" of "rescuing" the Minors, they would have still had the criminal intent to commit international parental kidnapping); and (iii) insofar as Defendants sought to raise a necessity defense, neither the Second Circuit nor the United States Supreme Court have recognized such defense under § 1204. *See Malka*, 2022 WL 1488568, at *19–20.

At trial, before commencing the last day of jury selection proceedings, the Government raised concerns that Defendants, who at the time were proceeding *pro se*, would make their "rescue" argument despite the Court's ruling precluding such argument based on Defendants' comments during jury selection proceedings and their history of not complying with the Court's other orders and rules. (Trial Tr. at 425–28.) The Court addressed Defendants directly and asked them whether they had read and understood the Court's rulings on the parties' motions in *limine*, to which both Defendants said they did. (*Id.* at 429–30.) The Court then asked Defendants to assure it that they would follow those rulings and comply with the Court's orders and rules, to which Defendants said they would. (*Id.* at 430, 32. ("Your Honor, yes, we will always abide the Court or whatever the Court rules - - .").) Mordechay even asked clarifying questions about the Court's rulings, which the Court answered all in detail, including some about their "rescue" argument. (*Id.* at 430–44.)

Immediately thereafter, Mordechay argued for the Court to reconsider its ruling on the "rescue" argument, but after the Court denied it, he later expressed doubt about the extent of the Court's ruling, for which the Court advised Mordechay to consult with his standby counsel about its rulings. (*Id.* at 444–55.) The Court further directed Defendants to reread its rulings and asked their respective standby counsel to confer with them. (*Id.* at 455–56.) Yet, Mordechay continued to ask the Court for clarification having not reread the Court's rulings and consulted with his standby counsel. (*Id.* at 456–63.) At one point, after Mordechay represented that his standby counsel had told him that they did not know what the ruling meant, the Court noted for the record that standby counsel had shaken their heads in disagreement with Mordechay, and it further expressed: "I think the problem is you're not willing to pay attention and you're not willing to accept, you know, their consultation. That's what I think it is, with all due respect." (*Id.* at 458.)

The next day, before swearing in the jury and giving its preliminary instructions, the Court read into the record a detailed explanation about each of its rulings on the parties' motions to dismiss for the benefit of Defendants. (*Id.* at 514–19.) Notwithstanding, Mordechay continued to ask the Court for clarification about its rulings and how these would apply to his theory of defense; in other words, Mordechay was seeking legal advice from the Court. (*Id.* at 519–21.) The Court, once again, advised Mordechay to consult with his two standby counsel. (*Id.* at 521.) But Mordechay continued to ask the Court for "clarification" and also, contradictorily, to express his disagreement with the Court's rulings. (*Id.* at 521–23.) In the end, the Court warned Mordechay that he was "showing a pattern of delay and attempting to delay the proceedings," as well as demonstrating that he had no intentions to follow the Court's rulings, and brought the jury to swear them in. (*Id.* at 523.)

But despite the Court's written rulings and its multiple clarifications on the record, as well as Defendants' multiple unsuccessful motions for reconsideration and purported consultation with standby counsel, Defendants nonetheless failed to abide by the Court's rulings. For instance, Defendants vigorously argued to the jury on opening arguments that they were trying to "rescue" the Minors because the Minors were allegedly abused. (*See, e.g.*, *id.* at 556–57; *id.* at 644–46.) Matityau also raised such argument during a cross examination he conducted *pro se*. (*Id.* at 780.) And even after the Court revoked Defendants' *pro se* status on several bases, including their continuous failure to abide by its orders and rules, counsel for Defendants also sought to "open the door" for the "rescue" argument by eliciting testimony in support of it. (*See, e.g.*, *id.* at 1105, 1110, 1254, 1256, 1264, 1414–15, 1417, 1469.) In fact, Mordechay's counsel expressly suggested the same argument to the jury during summations:

> And Judge Roman will probably tell you that reasons or motives for engaging in the alleged conduct don't matter. But what does matter, what is a crucial element of the crime, is intent, that the government has to prove what Mordechay intended beyond a reasonable doubt. And regardless of what anybody else did or planned to do, Mordechay never intended to obstruct Sara's parental rights. He testified to that. *He testified that his intent was to help her, and the government did not prove otherwise.*

(*Id.* at 1693 (emphasis added).)

At any rate, in his instant motion, Mordechay fails to provide a single legal authority (not even a non-binding one) to support his argument that the Court committed legal error in precluding his "rescue" argument and the purportedly supporting evidence. Accordingly, because Mordechay fails to provide any new theories or legal support "that would justify the Court's revisiting and overruling its prior decisions," or even to suggest "the Court's pretrial rulings give rise to a concern that an 'innocent person may have been convicted,'" the Court denies his motion for a new trial

on this basis. *United States v. Flom*, 256 F. Supp.3d 253, 271–72 (E.D.N.Y. 2017) (citations omitted).

###### C.   *Alleged Prosecutorial Misconduct During Summations*

Lastly, Defendants argue that the Government allegedly committed prosecutorial misconduct at summations by making improper inferences to the jury that were highly prejudicial. (Matityau Mot. at 10–13; Mordechay Mot. at 7–10.) But the Court disagrees.

"It is well-settled that both the 'prosecution and defense are entitled to broad latitude in the inferences they may suggest to the jury during closing arguments,' provided they do not misstate the evidence, refer to facts not in evidence, or express counsel's personal belief as to guilt or innocence." *United States v. Smith*, 778 F.2d 925, 929 (2d Cir. 1985) (quoting *United States v. Suarez*, 588 F.2d 352, 354 (2d Cir. 1978)). Indeed, "reversing a criminal conviction for prosecutorial misconduct is a drastic remedy that courts generally are reluctant to implement," *United States v. Valentine*, 820 F.2d 565, 570 (2d Cir. 1987), and the Second Circuit has made clear that "'[i]nappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding,'" *United States v. Elias*, 285 F.3d 183, 190 (2d Cir. 2002) (quoting *United States v. Young*, 470 U.S. 1, 11–12 (1985)). "The statements must amount to flagrant abuse, causing substantial prejudice." *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) (internal quotation marks and citations omitted); *see also United States v. Bautista*, 23 F.3d 726, 732 (2d Cir. 1994) (to prevail on claim of prosecutorial misconduct during summation, defendant must demonstrate that the prosecutor's improper remarks caused him "substantial prejudice").

A defendant asserting that a prosecutor's remarks warrant reversal "face[s] a heavy burden, because the misconduct alleged must be so severe and significant as to result in the denial of [his]

right[] to a fair trial." *United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). Thus, "[i]t is a rare case in which improper comments in a prosecutor's summation are so prejudicial that a new trial is required." *United States v. Forlorma*, 94 F.3d 91, 93 (2d Cir. 1996) (internal quotation marks omitted); *accord United States v. Germosen*, 139 F.3d 120,128 (2d Cir. 1998). Reversal is warranted "only where the statements, viewed against the entire argument before the jury, deprived the defendant of a fair trial." *Forlorma*, 94 F.3d at 94 (internal quotation marks omitted). In making this determination, the Second Circuit considers three factors: "(1) the severity of any misconduct, (2) the measures taken to cure the misstatements, and (3) their likely effect on the outcome." *Id.* at 95 (citing *United States v. Russo*, 74 F.3d 1383, 1396 (2d Cir. 1996)).

Here, after reviewing the arguments made at summations, the Court concludes that at no point did the Government make any improper remarks or suggest any improper inferences to jury. For example, Matityau argues that the Government's remarks at summations about Alter being a co-conspirator because he was a "loyal foot soldier" from Lev Tahor and because he played by the same "play book" were improper. (Matityau Mot. at 10–13.) He argues that no evidence at trial indicated that Alter was part of the conspiracy, and instead, only indicated that he was part of Lev Tahor. (*Id.*) Thus, Matityau argues the Government's remarks improperly suggested that Matityau was guilty upon mere association with the Lev Tahor community. (*Id.*)

But as the Court discussed in detail above, contrary to Matityau's arguments, there was "competent, satisfactory and sufficient evidence in the record" from which a rational trier of fact could not only conclude that Alter was part of the charged conspiracy, but also that Matityau was guilty even in the absence of the evidence of the March 2021 kidnapping attempt. *Ferguson*, 246 F.3d at 134 (citation and internal quotation marks omitted). Hence, the Government's remarks

were proper and caused no substantial prejudice to Matityau so as to render his trial unfair. *See Forlorma*, 94 F.3d at 94.

On the other hand, Mordechay argues that the Government's comments at summations about the religious marriage of Jacob Rosner and Jane Doe, including the nature and purpose of their marital relationship, and about Defendants' motive not being to "rescue" or "help" the Minors, were improper. (Mordechay Mot. at 7–10.)

With respect to the Government's remarks about Jane and Jacob's religious marriage, the Court had previously ruled that the Government could elicit testimony related to the religious marriage because it was "inextricably intertwined" with the charged offenses as it provided "the whole rationale for the Defendants executing" the kidnapping of the Minors. *Malka*, 2022 WL 1488568, at *10. In fact, Mordechay himself brought up the existence of the religious marriage between the nineteen-year-old Jacob and thirteen-year-old Jane at trial. (*See, e.g.*, Trial Tr. at 1417–18 (Mordechay discussing the religious marriage on direct examination); *id.* at 1684 (Mordechay describing the relationship between Jane and Jacob as a "love story").) The Court also allowed the Government to present evidence that the purpose of this religious marriage was for procreation—an assertion which even Defendants themselves conceded in their briefing for their motions in *limine*. *See Malka*, 2022 WL 1488568, at *11. As such, none of the excerpts from the Government's summations that Mordechay quotes in his briefing failed to comply with the Court's pretrial rulings.

To be sure, the Court did warn the Government that it would "closely monitor" its use of the term "procreation" or "marital relations" to ensure "that the term is not overused or employed in a prejudicial manner." *Id.* But the Court is of the view that the Government's remarks about procreation being the religious marriage's purpose were neither improper nor employed in a

prejudicial matter. (*See, e.g.*, Trial Tr. at 1630, 1725, 1729–31.) Indeed, the Government's "strongest" relevant remark was that "[t]he defendants were not helping this young girl by sneaking her away from her mother and returning her to a sexual relationship with an adult, but even if they were, that is not a defense." (*Id.* at 1630.)

And as to the Government's other remarks, the Court is of the view that the Government made these remarks simply in response to the arguments Defendants made—in violation to this Court's pretrial rulings—that they were seeking to "rescue" or "help" the children escape purported abuse and maltreatment. For example, during his opening statements as a *pro se* defendant, Mordechay failed to abide by the Court's pretrial rulings by telling the jury that "[t]his is a case of innocent people, caring family members, who the government are accusing them for allegedly devoting themselves to what? *To provide help to help [sic] these kids, the abused hostage children for - - .*" (*Id.* at 555 (emphasis added).) Mordechay also told the jury on opening statements that the "children were *violently* removed - - " from the Lev Tahor community. (*Id.* at 556 (emphasis added).) And as mentioned above, Mordechay's own counsel also argued at summations that her client "testified that *his intent was to help her*, and the government did not prove otherwise." (*Id.* at 1693 (emphasis added).)

For his part, Matityau also mentioned during a cross examination he conducted *pro se*: "But I am not allowed to ask affirmative defenses, *the abuse of the children - - .*" (*Id.* at 780 (emphasis added).) Matityau himself testified during direct examination, which was conducted by his own counsel, that in the lead-up to the kidnapping, he was "concerned about Jane Doe and that he therefore decided to "*help her escape, to help her run away.*" (*Id.* at 1414–15 (emphasis added).)

With all that in mind, the Government's remarks in direct rebuttal to Defendants' arguments—arguments which they made in violation of the Court's pretrial rulings—were not

improper. *See United States v. Amato*, 86 F. App'x 447, 451 (2d Cir. 2004) ("Where as here, defense counsel makes arguments that are themselves improper, the government is granted greater latitude in its rebuttal."). If anything, the Court finds perplexing that Mordechay now argues that the Government's rebuttal remarks about Defendants' alleged motive to "rescue" the Minors were "calculated to inflame the passions or prejudices of the jury," *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981), when Defendants *themselves* were the ones who improperly raised those arguments to the jury in the first place and in violation of this Court's pretrial rulings. In effect, had Defendants not improperly raised such arguments in violation of the Court's pretrial rulings, the Government would have had no reason to make its rebuttal comments at summations of which Mordechay now complains.

Therefore, the Court concludes that contrary to Defendants' arguments, the Government made no improper remarks at summations because it did "not misstate the evidence, refer to facts not in evidence, or express counsel's personal belief as to guilt or innocence," *Smith*, 778 F.2d at 929 (citations omitted), or even "use[d] arguments calculated to inflame the passions or prejudices of the jury," *Modica* 663 F.2d at 1180. Accordingly, the Court denies Defendants' motions for a new trial on this basis because the Government's remarks did not deprive them of a fair trial. *See Forlorma*, 94 F.3d at 94.

## CONCLUSION

For the foregoing reasons, the Court DENIES Defendants' motions for judgment of acquittal and for a new trial. The Clerk of Court is directed to terminate the motions on ECF Nos. 687 and 691.

SO ORDERED:

Dated: August 25, 2022
      White Plains, NY

_____

NELSON S. ROMÁN
United States District Judge